IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BELOIT HEALTH SYSTEM, INC.,

                           Plaintiff,

   v.                                             OPINION and ORDER

SAVISTA, LLC,                                      24-cv-379-jdp

                           Defendant.

---

      Plaintiff Beloit Health System, Inc. hired defendant Savista, LLC to collect payments on Beloit Health's behalf from health insurance companies and other third-party payers. In 2020, Beloit Health terminated the contract, triggering a 90-day work-down period during which Savista continued collections efforts on existing accounts but did not receive any new referrals from Beloit Health. Both sides have sued each other for breach of contract. Beloit Health contends that Savista failed to meet its contractual obligations to collect on pending accounts during the work-down period, resulting in more than $600,000 in lost revenue. Savista contends that it was entitled to a higher fee during the work-down period, which Beloit Health refused to pay.

      Both sides move for summary judgment. Dkt. 24 and Dkt. 26. Beloit Health has not adduced evidence from which a reasonable factfinder could find that it suffered damages from any breach by Savista. The court concludes the contract did not entitle Savista to a higher fee during the work-down period. These rulings resolve all remaining issues in this case, so judgment will be entered in favor of Savista on the original claim and in favor of Beloit Health on the counterclaim. This case will be closed.

UNDISPUTED FACTS

The following facts are undisputed except where noted.

Beloit Health operates Beloit Memorial Hospital, which provides healthcare services and bills insurance companies and other third-party payers for those services. In 2018, Beloit Health contracted with nThrive Revenue Systems, LLC to perform several billing-related services on its behalf. Dkt. 1-1. nThrive later assigned its contractual rights and obligations to Savista.

The contract comprises a master agreement and several statements of work, two of which are relevant to this lawsuit. First, Savista agreed to provide Medicare accounts receivable services, which involved submitting claims for reimbursement for patients covered by Medicare and Medicare-managed care plans. *Id.* at 22–25 (Medicare accounts receivable statement of work). Second, Savista agreed to provide comprehensive denials management services, which involved following up with third-party payers when they denied claims and coordinating with Beloit Health to correct erroneous denials. *Id.* at 27–32 (denials management statement of work).

Beloit Health paid Savista a contingency fee for its services, which was generally 2.5 percent or 3 percent of collections. But the contract allowed Savista to increase the contingency rate by up to 10 percent if the volume of accounts that Beloit Health referred to Savista for collections decreased by more than 15 percent. *Id.* at 23, § 4.1(iii).

In August 2020, Beloit Health terminated the contract with Savista, effective at the end of October for denials management services and at the end of December for Medicare accounts receivable services. The parties do not explain why Beloit Health terminated the contract, but they agree that Beloit Health had the right to do so under the contract. The termination

triggered a 90-day work-down period, during which Beloit Health no longer sent Savista new accounts for collection, but Savista continued collections efforts on existing accounts. Savista collected $11,148,332.10 on behalf of Beloit Health during the work-down period, which ended on March 31, 2021. At the end of the work-down period, Savista provided Beloit Health with an Aged Trial Balance (ATB) spreadsheet listing the remaining unresolved accounts. The ATB showed 45,488 unresolved accounts at the end of the work-down period, with balances totaling $84,313,010.17. Savista also issued its final invoice to Beloit Health for services under the contract, which Beloit Health paid.

When Beloit Health analyzed the ATB, it concluded that Savista had not made sufficient collections efforts during the work-down period. Beloit Health identified 1,162 accounts within Savista's scope of work for which no payment had been obtained. Beloit Health concluded that Savista had failed to meet its contractual obligations for those 1,162 accounts. Dkt. 50 (second declaration of Beloit Health revenue cycle manager Julie Egebrecht), ¶¶ 7–11.

Beloit Health estimated that it lost $623,206.84 in payments due to Savista's failure to act on these 1,162 accounts.[1] Neither party explains in its briefs or proposed findings of fact how Beloit Health calculated its loss. But in response to Savista's interrogatories, Beloit Health explained that it multiplied the amount of each unpaid account by the percentage of collections Beloit Health had received from that payer during the fourth quarter of 2020. Dkt. 31-2, ¶ 18. For example, for unresolved accounts where Medicare was the payer, Beloit Health multiplied

---

[1] During summary judgment briefing, Savista pointed out some duplicate accounts in Beloit Health's damages calculation. Beloit Health admitted that removing the duplicates reduced its estimated damages by $41,184.97. Dkt. 50, ¶ 13.

3

the amount of the claim by 59 percent, because that was the average amount collected for Medicare claims in the fourth quarter of 2020.

In 2024, Beloit Health sought payment for Savista's alleged failures to process claims during the work-down period. In response, Savista informed Beloit Health that it was exercising its right under section 4.1(iii) of the Medicare accounts receivable statement of work to increase the contingency rate by 10 percent, asserting that the decrease in referrals during the work-down period triggered that section. Savista issued three new invoices for January, February, and March of 2021, which totaled $718,526.90. Beloit Health refused to pay these invoices, asserting that section 4.1(iii) did not apply to the work-down period. Beloit Health filed this lawsuit for breach of contract, and Savista counterclaimed, asserting that Beloit Health had breached the contract by failing to pay the new invoices.

This court has jurisdiction under 28 U.S.C. § 1332. Beloit Health is a Wisconsin corporation with its principal place of business in Beloit, Wisconsin. Savista is a limited liability company wholly owned by Savista Holdco, LLC, which is wholly owned by Savista Holdco II, Inc., a Delaware corporation with its principal place of business in Alpharetta, Georgia. The parties are citizens of different states and the amount in controversy is more than $75,000.

ANALYSIS

Savista moves for summary judgment on both the original claim and the counterclaim. Dkt. 26. Beloit Health moves only on the counterclaim. Dkt. 24.

Summary judgment is granted if the material facts are not genuinely disputed and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In response to a motion for summary judgment, a party must come forward

with admissible evidence to support every element on which it bears the burden of proof. *Id.* at 324. Summary judgment is the "put up or shut up" moment at which the non-moving party must demonstrate that it has evidence that warrants a trial. *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022).

The parties agree that Delaware law applies to both parties' substantive claims under the contract. *See* Dkt. 1-1, § 11.5.

### A. Beloit Health's claim against Savista

A breach of contract claim under Delaware law has three elements: (1) the existence of a contract; (2) breach of an obligation imposed by the contract; and (3) damage to the plaintiff stemming from the breach. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). The parties agree that Beloit Health and Savista had a contract, under which Savista was responsible for timely submitting claims to third-party payers, following up with payers to ensure that claims got processed, and processing denials to maximize payments for Beloit Health. *See* Medicare Accounts Receivable Statement of Work, Dkt. 1-1, § 5.1; Denials Management Statement of Work, Dkt. 1-1, §§ 5.1, 5.4. The other elements are contested. Beloit Health contends that during the work-down period following the contract's termination, Savista failed to take contractually required actions to recover payments from third party payers, resulting in a loss of revenue for Beloit Health. Savista contends that it took all required actions and that any unrecovered payments went unpaid for reasons beyond Savista's control.

Beloit Health has not adduced evidence sufficient to support its claim that it lost revenue due to Savista's failure to take contractually required actions during the work-down period. Beloit Health's claim is based on the 1,162 accounts for which Savista failed to collect any payment by the end of the work-down period. But it's not reasonable to infer inadequate

5

work simply because Savista didn't collect on those accounts. The parties agree that there are many reasons an account might not get paid that have nothing to do with Savista's contractual obligations, including issues with medical coding, lack of prior authorization, or errors in the patient registration process. *See* Dkt. 38. In this case, Savista's expert on healthcare revenue cycle, Julie Hardy, reviewed the underlying documentation for the 1,162 accounts and concluded that only one account equal to $167.30 might have gone unpaid because of Savista's failure to timely file the claim with the third-party payer. Hardy attributed the non-payment of the remaining 1,161 accounts to coding, registration, and other issues outside of Savista's control. *Id; see also* Dkt. 38-1 (table created by Hardy classifying the 1,162 claims by reason).

In response, Beloit Health provided a declaration from its director of revenue cycle Julia Egebrecht in an attempt to connect the non-payment of the 1,162 accounts to Savista's contractual obligations. Dkt. 50. Egebrecht says that she reviewed the same claims documentation as Hardy and that, contrary to Hardy, she believes the documentation shows that "Savista was not diligent in pursuit of reimbursement with many of the accounts and in a majority of cases missed timely filing deadlines, and missed them without any adequate excuse that is evident from those documents or from the communications between [Beloit Health] and Savista of which we have any record." *Id.* ¶ 21.

Egebrecht states that she reviewed the documentation for all the accounts and concluded that Savista was "not diligent in pursuit of reimbursement." The problem for Beloit Health is that Egebrecht explains how Savista breached the contract for only three accounts: nos. 13161820, 12938425, and 10243907. Dkt. 50, ¶¶ 22–32. According to Egebrecht, account no. 13161820 was denied because of coding errors. Savista corrected the errors and resubmitted the claim to the payer, but then failed to follow up with the payer, which never

6

paid the claim. Account no. 12938425 was denied after the payer determined that the underlying service was not covered by the patient's insurance. Savista submitted a corrected claim, but Egebrecht says that it should have submitted an appeal instead, because the error was on the payer's side rather than Beloit Health's. When the payer again denied the claim, Savista failed to follow up. Account no. 10243907 involved a Medicare patient whose claim was sent to Savista so it could file the claim with Medicare. Savista placed the claim on hold until Beloit Health finished coding it. But Savista didn't prod Beloit Health to complete the coding, and the filing deadline for the claim expired before the coding was completed.

Even if Egebrecht's declaration were sufficient to show that Savista breached its duty for those three accounts, plus the single account that Savista's expert conceded may have gone unpaid because of Savista's actions, that still leaves 1,158 accounts for which there is no evidence in the record that Savista breached the contract. Egebrecht says that the three accounts are sufficient to put all the others at issue "insofar as three makes a pattern," because the three accounts are "representative of the types of omissions, errors, and breaches of Savista that are typically responsible for the nonpayment on all the accounts we included in the Damages Spreadsheet." *Id.* ¶¶ 22, 32. But Egebrecht does not say how she determined that the three accounts were representative examples, nor how she analyzed the other accounts and determined that the same problems existed in those accounts. Without some explanation of how Egebrecht analyzed and classified all the accounts, it is not reasonable to infer that the problems Egebrecht identified in the three examples extend to the other 1,158 accounts.

There is another problem with those four accounts. To survive summary judgment, Beloit Health must adduce evidence that Savista's breach caused Beloit Health's losses. *See Paul v. Deloitte & Touche*, LLP, 974 A.2d 140 (Del. 2009) (affirming summary judgment for

7

defendant because of plaintiff's failure to show any damages). The parties agree that there are legitimate reasons why a third-party payer might refuse to pay a claim: if the claim is not covered by the patient's insurance plan, for instance, or if the patient has a second plan that bears primary responsibility for paying the claim. So the mere fact that Beloit Health was not paid for these four accounts does not mean that it suffered damages. Beloit Health must adduce evidence allowing for a reasonable inference that the accounts would have been paid if not for Savista's breach.

For all but one account, Beloit Health does not even attempt to show that the accounts would have been paid if not for Savista's failure to fulfill its contractual obligations. The only exception is account no. 12938425. That account was for a patient who received an ultrasound imaging study; the payer denied the claim on the basis that the ultrasound was not covered by the patient's insurance plan. In her declaration, Egebrecht says that she "reviewed the underlying medical records and can attest that this denial was improper, because the imaging services at issue were a covered benefit when ordered by a specialty provider, as these were." Dkt. 50, ¶ 26(e). But Egebrecht's opinion on this point is entirely lacking in foundation because Beloit Health hasn't submitted any of the documentation that Egebrecht says she reviewed. Egebrecht's opinion would be inadmissible if her review of the medical records required any specialized knowledge, because Beloit Health did not disclose Egebrecht as an expert under Federal Rule of Civil Procedure 26(a)(2). The bottom line is that Beloit Health has adduced no admissible evidence that it suffered damages because of Savista's alleged breach of contract. The court will grant summary judgment on Beloit Health's breach of contract claim against Savista.

One final issue: in its response brief, Beloit Health advances an alternative theory based on a breach of § 5.7 of the Medicare accounts receivable statement of work, which requires Savista to provide an onsite general manager to "direct[], manage[], and coordinate[] the overall daily operations" at the hospital. Beloit Health argues that any problems with patient registration, coding, or other billing-related tasks that occurred before Savista acquired the accounts would still be attributable to Savista because the onsite general manager should have worked with Beloit Health to address those problems. But contract terms stating that Savista would supply an onsite general manager to "direct," "manage," and "coordinate" billing operations don't imply that Savista will be responsible for all problems related to billing. Beloit Health doesn't identify anything that the contract required the onsite general manager to do that he didn't do, so there is no evidence that Savista breached this part of the contract either.

**B.  Savista's counterclaim against Beloit Health**

After Beloit Health brought this lawsuit, Savista counterclaimed, asserting that Beloit Health owed it $718,526.90 for services rendered during the work-down period. Savista's counterclaim rests on § 4.1(iii) of the Medicare accounts receivable statement of work, which reads as follows:

> The agreed upon aged trial balance ("ATB") is set forth in SOW, Exhibit A The account and dollar values in the ATB were used to provide the fees in section 4.1.1 (i) and (ii). If the Clients Referred Accounts and dollar values change materially and/or the continued referrals decrease, nThrive has the right to increase the rate listed in Section 4.1.1 (i) on retrospective and prospective accounts up to 10% (Example: 10% + 1.2% = new rate of 11.2%). For the purposes of this section, material change means the volume of Referred Accounts decreases in amount equal to or great than 15% from the ATB in SOW, Exhibit A.

Dkt. 1-1, at 23.

9

Savista contends that it received no new referrals from Beloit Health during the work-down period; thus, referrals decreased by at least 15 percent and Savista had the right under § 4.1(iii) of the Medicare accounts receivable statement of work to increase its contingency rate for collections by 10 percent. Beloit Health counters that § 4.1(iii) applies only to decreases in referrals while the contract was in effect, not to the natural end of referrals incidental to the contract's termination.[2]

The counterclaim presents a straightforward issue of contract interpretation. In interpreting the parties' contract, the court must give effect to the intent of the parties as reflected in the four corners of the agreement. *Bathla v. 913 Mkt., LLC*, 200 A.3d 754, 759–60 (Del. 2018). Delaware follows an objective theory of contract interpretation; that is, the proper interpretation is how the contract would be understood by a reasonable person in the position of the parties. *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023). The court must read the specific provisions of the contract in light of the entire contract and with an understanding of the commercial context between the parties. *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926 (Del. 2017). Clear and unambiguous language should be given its plain meaning. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

---

[2] Beloit Health also contends that Savista waived any claim based on § 4.1(iii) by invoicing Beloit Health for only its regular contingency fee in 2021. Beloit Health points to emails from 2021 between Savista staff, including its general counsel, and Beloit Health, in which Savista staff said that the invoices under the regular fee were the "only two outstanding invoices at this time." Dkt. 24-3, at 2. Waiver under Delaware law requires an "unequivocal" showing that a party intended to waive a provision of the contract. *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005). The court need not resolve the waiver issue because the counterclaim fails on the merits.

The court concludes that the contract language unambiguously supports Beloit Health's reading of § 4.1(iii). The contract anticipated that Beloit Health would refer claims to Savista for collections and that Savista would receive a contingency fee on all the claims for which it collected a payment. Because Savista worked on contingency, it would have made less money if Beloit Health referred fewer claims. The section at issue here, § 4.1(iii), appears intended to address that risk by allowing Savista to increase its fee during lower-volume periods. Read in context, it's not reasonable to say that § 4.1(iii) was meant to encompass changes in the quantity of referrals caused by the termination of the contract. Section 4.1(iii) is triggered when referral volumes decrease by at least fifteen percent, protecting Savista during lower-volume times. Once the contract is terminated, the number of referrals will fall to zero. A reasonable person in the parties' position would understand that not as a decrease in the volume of referrals, which would trigger section 4.1(iii), but as a termination of the parties' relationship.

In its response brief, Savista points to § 1.3 of the Medicare accounts receivable statement of work, which sets forth the parties' expectations for the work-down period. That section states that, in the event of termination without cause, Savista "shall be due its fee for all Collections in its billed Inventory for a period of 90 days from the effective date of such termination." Savista argues that § 1.3 means that Beloit Health is obligated to pay Savista its contingency fee during the work-down period, including any increase required by § 4.1(iii). But § 1.3 actually supports Beloit Health's position. It would have been clear to both parties when they drafted § 1.3 that there would be no referrals during the 90-day work-down period contemplated by that section. So if the parties intended Savista to receive a much higher contingency fee during that period, one would expect that to be spelled out expressly in § 1.3.

11

But instead, the parties agreed that Savista would receive "its fee" during the work-down period, suggesting that they intended the fee to be the same fee Savista had received during the rest of the contract period.

In sum, the court concludes that Savista is entitled only to its regular contingency fee for work performed during the work-down period. The parties agree that Beloit Health already paid that fee, so Beloit Health is entitled to summary judgment on Savista's counterclaim.

ORDER

IT IS ORDERED that:

1. Plaintiff Beloit Health System, Inc.'s motion for summary judgment on defendant's counterclaim, Dkt. 24, is GRANTED.

2. Defendant Savista, LLC's motion for summary judgment, is GRANTED as to plaintiff's claim against Savista and DENIED as to Savista's counterclaim.

3. The clerk of court is directed to enter judgment for Savista on Beloit Health's claim, and for Beloit Health on Savista's counterclaim, and to close this case.

Entered August 27, 2025.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge